

George C. Paine, II
US Bankruptcy Judge
Dated: 11/02/10



# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE:<br>**FAIRVUE CLUB PROPERTIES, LLC**<br>**FOXLAND CLUB PROPERTIES, LLC**<br>**FOXLAND HARBOR MARINA, LLC**<br>Debtor. | Case No. 309-13807<br>Case No. 310-03566<br>Case No. 309-14911<br>Chapter 11<br>Hon. George C. Paine, II |

## MEMORANDUM

This matter came before the court on confirmation of the Chapter 11 Amended Plans of Reorganization dated October 4, 2010[1] in Fairvue Club Properties, LLC ("Fairvue"), Foxland Club Properties ("Foxland"), and Foxland Harbor FHM, LLC ("FHM" and jointly ("debtors")). The three debtors have not been substantively consolidated nor are the debtors jointly administered, but the Amended Plan in each case is identical and proposes a joint reorganization. Creditors of each of the debtors originally objected to the plan, and all objections were resolved with the exception of American Security Bank & Trust Company ("ABST"). ABST objected to confirmation in all three cases based generally on the following: (1) the debtors' plan violates the "absolute priority rule" found in 11 U.S.C. § 1129B0(2)(B)(i)-(ii);

---

[1] The same plan of reorganization was submitted in all three cases. Although both parties refer to the Amended Plan dated October 4, 2010, the last amended plan filed with the court is dated August 3, 2010. The October 4 plans were admitted as Exhibit 2.

(2) the plan is not feasible pursuant to 11 U.S.C. § 1129(a)(11); (3) the plan is not fair and equitable as required by 11 U.S.C. § 1129(b)(1); and (4) the plan was not filed in good faith as required by 11 U.S.C. § 1129(a)(3). For the reasons more particularly described herein, the court SUSTAINS the objections of ABST and denies confirmation of the debtors' amended chapter 11 plans.

In 2009, TLP DevCo[2] transferred assets to Fairvue, Foxland and FHM as indicated in the following chart:



The three debtor entities are 100% owned by the Leon Moore 2009 Irrevocable Trust.[3] Fairvue, Foxland and FHM received credit for the entire purchase price

---

[2] TLP DevCo is wholly owned by Sholodge, Inc. Leon Leslie Moore, who is also a chapter 7 debtor, is a major shareholder of Sholodge, Inc. TLP DevCo currently has no assets according to the testimony of Fairvue Club Operations Manager, Chris Wicke.

[3] According to the Debtors' Disclosure Statement, the beneficiaries of the 2009 Irrevocable Trust are Linda Moore (wife of Leon Moore), Paige Collier (daughter of Leon Moore), Leon Moore's grandchildren, and L. Shane Moore (Leon Moore's son). The Co-Trustees of the Trust are Linda Moore and Paige Collier. The Directors are

because the assets purchased by each entity[4] were transferred subject to a debt secured by such assets. TLP DevCo agreed to indemnify Fairvue, Foxland and FHM with respect to secured debt that was in excess of the purchase price of the assets purchased by each entity. The assets of each of the entities that were transferred were subject to the following liens (according to the debtors' disclosure statements):

| ESTATE | ASSET | LIENHOLDER & PRIORITY | AMOUNT |
| --- | --- | --- | --- |
| Fairvue | Fairvue Golf Course | Sumner County Real Property Taxes<br>City of Gallatin Real Property Taxes<br>ABST (1st Priority)<br>Leslie Leon Moore 1997 Irrevocable Trust (2nd Priority) | $124,771<br>$75,466<br>$3,559,371<br>$666,210 |
| Fairvue | Fairvue Clubhouse & Restaurant | Sumner County Real Property Taxes<br>City of Gallatin Real Property Taxes<br>First State Bank (1st Priority)<br>Leon Moore Family Trust (2nd Priority)<br>Leon Moore, assigned to ABST (3rd Priority)<br>Leslie Leon Moore 1997 Irrevocable Trust (4th Priority) | $42,403<br>$20,774<br>$1,979,070<br>$0<br>$0<br>$0 |
| Foxland | Foxland Golf Course | Sumner County Real Property Taxes<br>City of Gallatin Real Property Taxes<br>Wilson Bank & Trust (1st Priority) | $105,075<br>$51,548<br>$2,995,349 |
| Foxland | Foxland Clubhouse | Sumner County Real Property Taxes<br>City of Gallatin Real Property Taxes<br>Wilson Bank & Trust (1st Priority)<br>Leon Moore Family Trust (2nd Priority) | $62,862<br>$30,838<br>$2,995,349<br>$0 |
| FHM | 2.28 acres on Old Hickory Lake | Sumner County Real Property Taxes<br>City of Gallatin Real Property Taxes<br>Leon Moore, assigned to ABST (1st Priority)<br>Leon Moore Family Trust (2nd Priority) | $8,521<br>$3,624<br>$509,629<br>$290,371 |

---

as follows: Leon Moore (President), Paige Collier (Secretary), and Linda Moore (Director).

[4] Fairvue purchased the following assets: 18 hole golf course known as Fairvue Lakes Golf Course, Fairvue Clubhouse, including a practice facility, maintenance building, clubhouse with restaurant and locker and pro shop, and swimming facilities (list not exhaustive). Foxland purchased the following: 18 hole golf course known as Foxland Course, Foxland Clubhouse, including the Foxland mansion building, a temporary golf shop, and a restaurant building with restrooms (list not exhaustive). FHM owns 2.28 acres on Old Hickory Lake.

All three debtor entities filed chapter 11 bankruptcy petitions shortly after the formation of Foxland, Fairvue, and FHM entities.[5] The debtors immediately sought to reorganize these entities through a joint operation of all three entities. The debtors' Pretrial Brief summarizes the community arrangement:

> The Amended Joint Plan of Reorganization dated October [4], 2010, is a joint plan of three Debtors: Fairvue Club Properties, LLC ("Fairvue"), Foxland Club Properties, LLC ("Foxland") and Foxland Harbor FHM, LLC. ("Foxland FHM"). The principal assets consist of two 18 hole golf courses. Fairvue Golf Club and Foxland Golf Club--, a Clubhouse with pool and amenities at Fairvue, and two acres along Old Hickory Lake that will be the location of a future lake FHM. The complication in this case is that the three real property lenders have overlapping collateral. American Security by virtue of an assignment of the lien of Leon Moore, has a first priority lien on the Fairvue Golf Club property and a first priority lien on the Foxland FHM property. It is not disputed that the American Security secured claim is fully secured. However, American Security does not have a first priority lien on the Fairvue Clubhouse. The first priority lien on the Clubhouse is held by First State Bank. Wilson Bank, on the other hand, has a first priority lien on the Foxland Golf Club and an unoccupied mansion on that property.
>
> Only a pro shop is operated on that golf course. Because of the overlapping liens and the fact that the Debtors' believe that the combined value of the Debtors' real property will maximize its revenues, the Debtors assert that it is best to combine their operations into one Joint Plan.

**Debtors' Memorandum in Support of Plan Confirmation**, Oct. 10, 2010, Docket # 144 as filed in Case Number 309-13807.

The debtors plan proposes that assets, liabilities, and operations of the debtors will continue in the same entity as currently exists, but ownership of

---

[5] The exact dates of the filing the chapter 11 petitions are as follows:

Fairvue: December 1, 2009
FHM: December 31, 2009
Foxland: April 1, 2010

4-U.S. Bankruptcy Court, M.D. Tenn.

Case 3:09-bk-13807 Doc 154 Filed 11/02/10 Entered 11/02/10 12:03:10 Desc Main Document Page 4 of 18

Fairvue, Foxland and FHM, will change from the following to the following:[6]

| Entity | At Filing Owned By: | Post-Confirmation Owned By: |
|---|---|---|
| **Fairvue** | Leon Moore 2009 Irrevocable Trust | Leslie Leon Moore 1997 Irrevocable Trust ("Insurance Trust") will become owner in exchange for release of $500,000 of secured junior lien. |
| **Foxland** | Leon Moore 2009 Irrevocable Trust | The Leon Moore Family Trust (1987) will become owner by converting Trust's unsecured claim to equity. |
| **FHM** | Leon Moore 2009 Irrevocable Trust | The Leon Moore Family Trust (1987) will become owner in exchange for $100,000 of secured junior lien. |

The management team at Fairvue will manage and operate the Fairvue and Foxland Golf Courses and associated Clubhouses in order to meet the payment obligations under the confirmed plans. As for FHM, the debtors' Disclosure Statements explain as follows:

> The Marina Property is part of a larger plan to develop approximately ten adjoining acres owned by Oakbrook Realty & Investments II, LLC, an unrelated entity to the Debtors. Foxland Development Corporation, a subsidiary of Sholodge, has entered into a purchase agreement with Oakbrook for the purchase of the adjoining property, but currently that agreement is in default. The long range plan for the Marina development is that the adjacent property will include a restaurant, retail space, golf club house, townhomes and condominiums. The only interest owned by Foxland Marina, however, is the two acre tract to be used for parking and access to the marina docks. Assistance in this development has been provided by Bobby Reed. Despite a verbal commitment by Leon Moore to provide Bobby Reed with ah 15% of the ownership of the development if it gets completed, there exists no written agreement as to his compensation for services.

Although First State Bank (1st lien on Fairvue Clubhouse and restaurant), the Internal Revenue Service (unsecured priority and unsecured claims), and Wilson Bank & Trust (1st lien on Foxland Golf Course and Clubhouse) filed objections to the

---

[6] The beneficiaries of the Leon Moore 2009 Irrevocable Trust, the Insurance Trust and the Leon Moore Family Trust are the same: Linda N. Moore, L. Shane Moore, L. Paige Collier, and grandchildren of Leon Leslie Moore.

Debtors' Amended Plans, the parties mutually resolved all objections. By the confirmation hearing, ABST was the single objecting creditor. ABST's objections, in summary, are as follows: (1) the debtors' plan violates the "absolute priority rule" found in 11 U.S.C. § 1129B0(2)(B)(i)-(ii); (2) the plan is not feasible pursuant to 11 U.S.C. § 1129(a)(11); (3) the plan is not fair and equitable as required by 11 U.S.C. § 1129(b)(1); and (4) the plan was not filed in good faith as required by 11 U.S.C. § 1129(a)(3).

## DISCUSSION
### A. Confirmation Generally

In order to confirm a plan of reorganization, the requirements set forth in 11 U.S.C. § 1129(a), with the exception of § 1129(a)(8) must be satisfied. **In re Sis Corp**., 120 B.R. 93, 95 (Bankr. N.D. Ohio, 1990). The burden of proof at confirmation is on the plan proponent (here, the Debtors) to show by a preponderance of the evidence that all of the requirements of § 1129 are met, including feasibility. **In re Hurricane Memphis, LLC,** 405 B.R. 616 (Bankr. W.D. Tenn., 2009); **In re The Christian Faith Assembly**, 402 B.R. 794, 798 (Bankr. N.D. Ohio 2009) (citations omitted).

### B. Section 1129(a)(11) "Feasability"

"Section 1129(a)(11), commonly referred to as the feasibility requirement, allows a court to confirm a Chapter 11 case only if '[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.' " **In re Mallard Pond Ltd.**, 217 B.R. 782, 784-785 (Bankr. M.D.Tenn. 1997). Further, while the

determination of the feasibility of a proposed plan is necessarily fact-intensive, the plan need only present a "reasonable assurance of success" by sufficiently establishing "a realistic and workable framework for reorganization." **In re Brice Road Developments LLC,** 392 B.R. 274, 283 (6th Cir. (BAP) 2008) (citations omitted). Relevant factors to a finding of feasibility are: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. **In re Hurricane Memphis, LLC,** 405 B.R. 616 (Bankr. W.D. Tenn., 2009) (**citing Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)**, 800 F.2d 581, 589 (6th Cir.1986) (citation omitted)).

Unfortunately, the Debtors' Amended Plans are not feasible. In order to present a reasonable assurance of success, the court must be able to determine "whether the things which are to be done under confirmation can be done as a practical matter under the facts."... The Court must determine that the debtor's financial projections presented to support the plan of reorganization are, " 'derived from realistic and reasonable assumptions which are capable of being met,' " **In re Hurricane Memphis, LLC,** 405 B.R. at 625 (**quoting Christian Faith Assembly**, at 799 (citations omitted)).

### 1. Debtors' Proof

The debtors' proof of feasability relied upon the testimony of Operations Manager Chris Wicke, Club Manager David Beard and VACO accountant Camille Fowler. Mr. Wicke testified generally about the history and structure of the debtors,

and the debts owed by each entity.  He explained that the plan provides to pay ABST interest only until April 2012, and then begin principal and interest payments on thirty year amortization schedule with a ten year balloon at an agreed upon interest rate.  Mr. Wicke verified that Andy Hinds' (the debtors' expert appraiser) economic projections used in reaching valuation were more conservative than the projections used by the debtors in the Amended Plans.

Ms. Camille Fowler is an accountant with VACO Resources and was hired by the debtors to prepare financial statements and provide other accounting services.  Ms. Fowler reviewed the debtors' Amended Plans and testified about how each of the Allowed Secured Claims would be paid under the plan.  On cross examination, Ms. Fowler testified that she had reviewed historical cash flow of the combined debtors, and cash flow had approached $1,000,000 for Fairvue, but it did not approach $2,000,000 at any point historically that she recalled.  She also explained that the more conservative projections of Mr. Hinds did not include some of the items that the debtors' projections included to make up the difference in their numbers.[7]

David Beard was the debtors' last witness.  Mr. Beard testified that Fairvue was basing its financial projections on very conservative membership growth at the two clubs.  Currently there are approximately 600 active golf members paying dues at Fairvue.  Beard felt certain that Fairvue's assumption of new member growth of ten per year was highly attainable.  Beard also testified about the debtors' financial projections based on new "semi-private" rounds allowing public play at certain

---

[7] Ms. Fowler did not testify specifically what the factors were in the debtors' projections that "made up for the differences" between Mr. Hinds projections and the debtors' projections going forward.

8-U.S. Bankruptcy Court, M.D. Tenn.

Case 3:09-bk-13807    Doc 154    Filed 11/02/10    Entered 11/02/10 12:03:10    Desc Main
Document      Page 8 of 18

hours. According to Beard, plan projections were based on the number of rounds played at a high of 61,990 in 2020 and at a low of 55,101 in 2011. He felt that Fairvue could sustain these numbers.

Beard testified that he knew Hinds' projections were less than the debtors, but that those differences could be easily explained. The difference between the debtor's projections of cash available for plan payments and Mr. Hinds' cash available for plan payments is at its highest just over $1,000,000. Mr. Beard explained that Mr. Hinds did not take into account the following:

| | | |
|---|---|---|
| 1. | Deferred Initiation Fee Payments: | Approximately $600,000 is not included in Mr. Hinds income amounts. |
| 2. | Hinds uses Lower "Rounds Played" Projections: | Hinds underestimated the amount of daily fee rounds |
| 3. | Beard Understanding Better: | Beard believes he knows what Fairvue and Foxland can do better than Hinds. |

Mr. Beard emphasized that he would do whatever it took, moving from 10 to 8 minute tee times, increasing membership dues or any other necessary step to make the Amended Plans work.

### 2. ABST's Proof

ABST called the debtors' expert, Andy Hinds, to testify about financial projections relied upon for the Amended Plan. Mr. Hinds is an expert with Hotel & Club Associates, Inc. out of Greensboro, North Carolina and specializes in the appraisal and feasability of hotels, golf properties and golf communities and resorts.

9-U.S. Bankruptcy Court, M.D. Tenn.

Mr. Hinds' Expert Report, dated September 21, 2010 values as follows[8]:

| Property | Value Date | "As Is" Market Value |
|---|---|---|
| Fairvue Lakes Golf Course | 9/9/2010 | $7,700,000 |
| Fairvue Lakes Clubhouse | 9/9/2010 | $2,200,000 |
| Foxland Golf Course | 9/9/2010 | $2,750,000 |
| Fairvue/Foxland 36 Hole Course | 9/9/12010 | $11,500,000 |
| Commercial Land/Proposed Marina | 9/9/2010 | $ 720,000 |

In reaching the $7,700,000 value, Mr. Hinds' used the "Income Capitalization Approach" which is described in Mr. Hinds' report as follows:

> A set of procedures through which an appraiser derives a value indication for an income-producing property by converting its anticipated benefits (cash flows and reversion) into property value. This conversion can be accomplished in two ways. One year's income expectancy can be capitalized at a market-derived capitalization rate or a capitalization rate that reflects a specific income pattern, return on investment, and change in the value of the investment. Alternatively, the annual cash flows for the holding period and the reversion can be discounted at a specified yield rate.

Three major components were considered: a market analysis of expenses and revenues of other comparable clubs in Fairvue's and Foxland's market, historical numbers from Fairvue and Foxland, and market trends in the golf world. With those three values, and other more minor considerations, Mr. Hinds came up with projections into the future, discounted for a present value.[9] Mr. Hinds' figures,

---

[8] Valuation is not per se a confirmation issue. However, Mr. Hinds' use of the "Income Capitalization Approach" to help determine value relies upon projections that are relevant to the feasability issue. Mr. Hinds used annual cash flow projections with a present value discount.

[9] Historical figures used by Mr. Hinds and historical figures contained in the debtors' Disclosure Statement are very different. Mr. Hinds thought that the difference was probably in the breakout of Foxland from Fairvue when, in actuality, they only started operating as separate entities in 2009. Hinds commented that he had done many complicated appraisals but the Foxland and Fairvue was very challenging because of the complex history. Because Mr. Hinds obtained his financial information from the debtors, the differences are puzzling, and were never adequately explained by the debtors. (footnote continued on next page).

which were complied from financial information provided by debtors' management, showed 2007 was the last positive cash flow year for operations for both Fairvue and Foxland. His three, near-by comparables all had positive cash flow of at least $367,693, but were well established and not in bankruptcy. Although Fairvue and Foxland are newer operations and emerging from bankruptcy, the comparables are helpful to see how Fairvue and Foxland should perform, showing stabilized operations, in a more normal market, and cash flowing between $300,000 to $500,000.

Based on Mr. Hinds' projections, he valued Fairvue at $7,700,000, but that number did not include approximately $600,000 in past deferred initiation fees which would make the overall value of the property slightly higher. Mr. Hinds testified that if his financial projections had been higher, then the value of Fairvue as a whole would have been higher as well. He performed the same analysis with Foxland. All of the same trends that Hinds found with Fairvue, he likewise found with Foxland, but explained that Foxland was even more raw as a business and therefore a more risky venture.

ABST also called Andrew Cantor, their hired expert, to testify about financial projections. Cantor has extensive experience with golf course acquisitions, value,

---

(continued footnote from prior page)

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Debtors ACTUAL Cash Flow | $593,898 | $991,840 | $770,585 | $903,357 | $682,155 |
| Fairvue ACTUAL Cash Flow |  |  | $358,067 | ($543,100) | ($253,121) |

11-U.S. Bankruptcy Court, M.D. Tenn.

projections and turnarounds having worked, among other places, as an underwriter where he underwrote at least $600,000,000 in golf course loans. He was qualified as an expert witness by the court.

Mr. Cantor found the debtors' financial projections unrealistic primarily because the number of rounds projected at Foxland was unreasonably high. While Foxland has theoretical capacity to handle the number of rounds, Foxland cannot meet the demands because golf is traditionally played at peak times. The Fairvue projections are not as offensive to Cantor because he believes a decent golf course operator could possibly achieve some of the Fairvue goals. Cantor was over 90% in agreement with Hinds' financial projections. Mr. Cantor testified that he would advise any bank loaning money on the debtors' projections that the loan is a "default waiting to happen." The debtors need, according to Cantor, to budget 2%-4% of revenues for capital expenditures, and the debtors failure to include that is, in Mr. Cantor's opinion, fatal. Mr. Cantor's testimony was uncontested, but the substance of his opinion was largely that he agreed with the testimony of Andy Hinds.

ABST's last witness was Miles McDonald, a turnaround specialist with Kraft CPAs Turnaround and Restructuring Group. McDonald testified about the differences between the debtors' projections and Mr. Hinds' projections in five specific areas that are key to the fortitude of the debtors' plans: (1) Revenues, (2) Income Before Capital Expenditures, (3) Capital Expenditures, (4) Year End Memberships, and (5) Golf Rounds Played. After detailing each category in his testimony, he concluded that from an accounting perspective, the debtors would experience cash flow shortfalls in the first four years of the Amended Plans with or without the "no default" until September 2011 cushion in the Amended Plans.

12-U.S. Bankruptcy Court, M.D. Tenn.

Case 3:09-bk-13807    Doc 154    Filed 11/02/10    Entered 11/02/10 12:03:10    Desc Main
Document      Page 12 of 18

### 3. Analysis

The feasibility requirement of § 1129(a)(11) is meant to protect creditors against unrealistic plans that have little or no chance of success. **Id. (citing In re Adelphia Business Solutions, Inc**., 341 B.R. 415 (Bankr.S.D.N.Y.2003)). When assessing the future commercial viability of a debtor's business, the question of feasibility under § 1129(a)(11) is fundamentally one of whether the debtor has the ability to meet its future obligations, both as provided for in the plan and as may be incurred in its business operations. **Id.** (**citing** 7 COLLIER ON BANKRUPTCY, ¶ 1129.02[11], (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)).

Mr. Wicke's and Mr. Beard's testimony leave the court no doubt that they are committed to trying to successfully reorganize these debtors. However, as is clear from the expert testimony from Andy Hinds, Andrew Cantor and Miles McDonald, the debtors' Amended Plans do not provide a "realistic and workable framework" that presents a "reasonable assurance of success." **In re Brice Roads Dev.**, 392 B.R. at 283. While Mr. Wicke and Mr. Beard were credible witnesses, the court found Mr. Hinds, Mr. Cantor and Mr. McDonald credible as well, and their testimony was more persuasive. The burden of proof is on the plan proponent to show by a preponderance of the evidence that all of the requirements of § 1129 are met, and that burden was not met.

Mr. McDonald analyzed the conclusions of both Mr. Hinds and Mr. Cantor. Mr. McDonald's chart (below) explains the differences between the debtors' figures and Hinds' figures. The debtors' revenues projections are 14% to 23% higher than Hinds'

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Debtor | 5,349,899 | 7,011,099 | 7,848,622 | 8,484,622 | 8,561,092 | 8,795,021 | 9,004,653 | 9,304,517 | 9,488,988 |
| Appraiser | 4,547,698 | 5,996,494 | 6,453,594 | 6,561,011 | 6,909,680 | 7,133,001 | 7,375,910 | 7,687,754 | 7,836,882 |
| % Difference | 15% | 14% | 18% | 23% | 19% | 19% | 18% | 17% | 17% |
| **Income b/f CapEx** | | | | | | | | | |
| Debtor | 91,596 | 1,493,626 | 2,112,221 | 2,811,261 | 2,476,313 | 2,588,775 | 2,688,620 | 2,874,988 | 2,943,768 |
| Appraiser | (359,061) | 858,043 | 1,320,367 | 1,442,863 | 1,633,440 | 1,713,429 | 1,794,154 | 1,947,798 | 1,947,326 |
| % Difference | 492% | 43% | 37% | 49% | 34% | 34% | 33% | 32% | 34% |
| **Capital Ex** | | | | | | | | | |
| Debtor | -- | 50,000 | --- | --- | --- | --- | --- | --- | --- |
| Appraiser | -- | 183,659 | 1,320,367 | 1,442,863 | 1,633,440 | 1,713,429 | 1,947,798 | 1,947,798 | 1,947,326 |
| % Difference | | -267% | na | na | na | na | na | na | na |
| **Year End Membership** | | | | | | | | | |
| Debtor | 660 | 712 | 762 | 807 | 842 | 877 | 912 | 947 | 982 |
| Appraiser | 631 | 683 | 729 | 768 | 808 | 847 | 887 | 926 | 966 |
| % Difference | 4% | 4% | 4% | 5% | 4% | 4% | 3% | 2% | 2% |
| **Golf Rounds** | | | | | | | | | |
| Debtor | | | | | | | | | |
| Appraiser | 43,344 | 55,100 | 58,943 | 60,431 | 60,800 | 60,999 | 61,197 | 61.395 | 61,593 |
| % Difference | --- | 49,449 | 50,833 | 51,869 | 52,745 | 53,621 | 54,497 | 55,373 | 56,249 |
| | | 10% | 14% | 14% | 13% | 12% | 11% | 10% | 9% |

projections.[10] Mr. Hinds testified that the his projections show about $900,000 less in cash flow in in the first year. The debtors' projections grow to double Hinds' projections, and are likewise much higher than Hinds' three, near-by comparables, and the overall golf market averages. The debtors contend that the distinction is in the details, and the comparison is not apples to apples.[11] However, even

---

[10] Mr. Wicke admitted that Fairvue and Foxland together have not, in the history of their operations, had cash flow numbers as high as projected by the Amended Plans. Mr. Beard also testified that the Clubs had never cash flowed as high as the debtors' Amended Plan projections, but that was because the clubs had never offered daily fee play to the public.

[11] For example, according to the debtors, at a minimum the following upward adjustments should be made to Hinds' projections:

1. Initiation Fees: $200,000 per year not accounted for in Mr. Hinds' projections for years 1-3.

14-U.S. Bankruptcy Court, M.D. Tenn.

assuming the difference between Hinds' revenue numbers and the debtors' revenue numbers is cut in half, the debtors' projections are still between 7% and 11.5% higher than Mr. Hinds' projections. Hope and effort alone cannot make the debtors' projections attainable. The court simply finds the experts' projections more persuasive as to what these businesses can achieve.[12]

---

2. Taxes: The debtors' cash flow numbers show cash flow BEFORE taxes are paid, and Mr. Hinds show the cash flow after taxes are paid. To compare apples to apples, this would increase Hinds' cash flow figures by $300,000.

3. Reserves: The debtors' cash flow numbers show cash flow BEFORE reserves are paid, and Mr. Hinds show the cash flow after reserves are paid. To compare apples to apples, this would increase Hinds' cash flow figures by $181,000.

4. Cart Leases: The debtors' cash flow numbers show cash flow BEFORE expenses are paid, and Mr. Hinds show the cash flow after expenses are paid. To compare apples to apples, this would increase Hinds' cash flow figures by $145,000.

Some of these "adjustments" to Mr. Hinds' numbers were made by Mr. McDonald in his analysis.

[12] The debtors Amended Plan provided only $50,000 for capital expenditure in 2011 and allocated no money for the remaining life of the projections. The debtors post-trial brief provides as follows as to CapEx expenditures:

> Mr. Hinds had a capital reserve of $181,000 in the first year that gradually increased over time. The Debtors Joint Plan, on the other hand, has an Operating Reserve Account in the amount of $100,000 and a Capital Reserve Account in the amount of $50,000, both of which are to be funded from Net Operating Surplus and prior to any annual payments to unsecured creditors. See § 2.05, 2.21 and 2.22 of the Joint Plan. The Debtors agree that it would be better for the Debtors to have provision that allows the Capital Reserve to increase over time, as long as the funding continues to come from the Net Operating Surplus. Accordingly, the Debtors. propose that § 2.05 of the Joint Plan should be revised to read as follows:
>
>> "Capital Reserve Account" shall mean a segregated bank account to be funded in the amount of $50,000 from available funds after the Effective Date of the Plan. This Account will be used for capital expenses as determined by the General Manager of Fairvue and Foxland Clubs and will be replenished and funded prior to any distributions to Class 10 Allowed Claims. Each year following the Effective Date of the Plan, to

Mr. McDonald also included "Year End Membership" and "Golf Rounds Played" (non-financial categories) because the debtors' projections and the appraisers' projections are not that different, but are the baseline drivers of the projections. As to membership, Mr. Beard testified that he believed the debtors' plan to add ten new members per year at Fairvue was highly attainable. However, Mr. Beard admitted on cross examination that growth of ten members per year assumes active, paying members, and projections are based on a total membership of approximately 900 (active, paying members). Currently, Fairvue has some members on an inactive status called "Temporary Leave of Absence" ("TLA"). This means a member can request a leave from the club of one to three years where no dues or fees are assessed. Projections assume active, paying members. Thus, the debtors count on return of the TLA members as part of their projections, and also assume complete collectability of all fees. The expert testimony was in agreement that although adding ten new members per year might be attainable, the underlying assumptions of full collection and return to full paying membership is not. The court agrees.

Under the Amended Plan, Foxland will be a "semi-private" course. Rounds at Foxland will include member play, guest play, Fairview member play, and non-

---

the extent there exists Net Operating Surplus for the previous year, the Account will be further funded in an amount equal to 1% of the gross revenues generated by the Club operations at Fairvue and Foxland during the previous twelve months.

A similar provision existed in the Joint Plan dated August 3, 2010, but was mistakenly deleted in the amended version dated October 4, 2010. This amendment will provide for the initial funding of $50,000 of the Capital Reserve Account and then an amount of at least $50,000 per year thereafter. This amount is more consistent with the Hinds projection and yet will not impose a burden on the Debtors because the funding will occur from Net Operating Surplus.

In light of this, the court is looking at the funding of the capital expenditures in light of the debtors post-trial brief and not as listed in Mr. McDonald's numbers above.

16-U.S. Bankruptcy Court, M.D. Tenn.

Case 3:09-bk-13807 Doc 154 Filed 11/02/10 Entered 11/02/10 12:03:10 Desc Main Document Page 16 of 18

member daily play. Mr. Beard testified that rounds played projections range from 55,101 to 61,990 for both courses, but Mr. Hinds and Mr. Cantor found those numbers to be overly optimistic. According to Cantor, the courses have the physical capacity to support the debtors' projections, but physical capacity does not equate to actual rounds played.[13] In other words, demand for tee times occurs at certain peak hours, and during other times, the course can be nearly vacant. Cantor also questioned the debtors' proposed rates to be charged for daily fee play. In his opinion, the average daily fee rate of $50 per round was too high because much of the daily play will occur at off-peak hours that are usually priced lower.

The court finds Mr. Cantor's, Mr. Hinds' and Mr. McDonald's findings to be more reasonable and more grounded in sufficient supporting data. The debtors rounds played numbers put together by Mr. Beard and Ms. Fowler, while based partially on experience seem mostly grounded in desire.

### 4. Conclusions

Overall, the facts in this case boil down to burden of proof. The debtors cannot prove that their projections are anything more than an unrealistic plan that has little or no chance of success. ABST provided more credible evidence on the feasability issue. The court finds that the that confirmation of the Amended Plans would likely be followed by liquidation or the need for further reorganization pursuant to 11 U.S.C. § 1129(a)(11). The court, therefore, SUSTAINS ABST's objection to confirmation of the debtors' Amended Plans.

---

[13] Mr. Hinds' report also shows that the comparable clubs have lower rounds played numbers than that projected by the debtors.

17-U.S. Bankruptcy Court, M.D. Tenn.

Case 3:09-bk-13807    Doc 154    Filed 11/02/10    Entered 11/02/10 12:03:10    Desc Main
Document      Page 17 of 18

Although ABST also raised objections relating to the "absolute priority rule," good faith, and the plan not being fair and equitable, in light of the court's ruling on feasability, the court need not address these remaining objections. The court instructs counsel for ABST to prepare an Order not inconsistent with this court's Memorandum Opinion to be submitted to the court within seven (7) days of entry of the Memorandum.

**THIS MEMORANDUM WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

This Order has Been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.